*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 12a0059p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
————————————

BRANDY ANDLER,
       *Plaintiff-Appellant/Cross-Appellee,*

      *v.*

CLEAR CHANNEL BROADCASTING, INC.,
      *Defendant-Appellee/Cross-Appellant.*

Nos. 10-3264/3266

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 06-00265—Norah McCann King, Magistrate Judge.

Argued: December 1, 2011

Decided and Filed: February 29, 2012

Before: MARTIN, MOORE, and COOK, Circuit Judges.

————————————

## COUNSEL

**ARGUED:** Richard L. Lancione, LANCIONE, LLOYD & HOFFMAN, Bellaire, Ohio, for Appellant. Matthew L. Schrader, REMINGER CO. LPA, Columbus, Ohio, for Appellee. **ON BRIEF:** Richard L. Lancione, LANCIONE, LLOYD & HOFFMAN, Bellaire, Ohio, for Appellant. Matthew L. Schrader, REMINGER CO. LPA, Columbus, Ohio, for Appellee.

————————————

## OPINION

————————————

KAREN NELSON MOORE, Circuit Judge. Plaintiff-Appellant Brandy Andler appeals the district court's decision to exclude the testimony of her expert witness regarding loss of future earning capacity in her personal injury lawsuit against Defendant-Appellee Clear Channel Broadcasting, Inc. ("Clear Channel"). Clear Channel cross-appeals the denial of its motion for judgment as a matter of law on the issue of

liability.  Because the district court properly applied Ohio tort law, we AFFIRM the denial of Clear Channel's motion.  We REVERSE the district court's ruling on the evidentiary issue as an abuse of discretion, because the proffered expert testimony was not unreasonably speculative as a matter of law and the district court appears to have misunderstood the concept of lost earning capacity.  We VACATE the jury's award and REMAND for a partial new trial on the issue of damages.

## I.  BACKGROUND

In July 2004, Andler and her boyfriend Eric Heitzer attended the annual Jamboree-in-the-Hills country music festival in Belmont County, Ohio.  On the evening of July 13, Andler and Heitzer visited friends staying at a nearby campground owned and operated by Clear Channel as part of the festival.  Neither Andler nor Heitzer were staying at the campground.  Later that night, they left their friends and walked around the grounds, first stopping to listen to some campers play music and then, around 10:00 p.m., walking towards the restrooms.  On their way to the restrooms, Andler stepped off the path on which she was walking and fell into a six-to-eight-inch grass-covered hole, breaking several bones in both of her feet.  Andler contends that the hole was not visible because the grass growing in it reached the same height as the grass on the surrounding land.  As a result of her fall, Andler developed arthritis in her feet.

Andler brought suit under Ohio tort law, seeking damages for medical expenses and loss of earning capacity.  Prior to her injury, Andler worked part-time at a childcare center and earned between $9,000 and $10,000 a year.  According to Andler, her injuries forced her to switch jobs and, in the years following the injury, she has worked full-time as a manicurist and pedicurist; she earned approximately $10,000 in 2006 and $25,000 in 2008.

Clear Channel moved for summary judgment on the grounds that it did not breach its duty of care to Andler because she was a licensee and because the hole was an "open and obvious danger." The district court denied Clear Channel's motion, concluding that Andler was a business invitee and that genuine issues of fact existed as

to whether Clear Channel breached its duty of care and whether the hole was an "open and obvious danger."

At trial, Andler presented the videotaped deposition of accountant Daniel Selby, who testified, using Bureau of Labor Statistics ("BLS") figures, as to Andler's lost earning capacity due to the injury. Selby testified that, but for her injury, Andler could have earned approximately $17,600 a year as a full-time childcare worker; post-injury, her annual earning capacity as a full-time manicurist and pedicurist was approximately the same. When factoring in the effects of her work disability, such as increased likelihood of missed work or longer-term exit from the workforce, Selby concluded that Andler's damages for lost earning capacity totaled $232,346.[1]

After trial, the jury awarded Andler $200,000, including $148,000 for future economic damages.[2] Clear Channel appealed, and a prior panel of this court reversed on the grounds that the district court erred in refusing to instruct the jury on the "open and obvious danger" doctrine. *Andler v. Clear Channel Broad., Inc.*, 342 F. App'x 100 (6th Cir. 2009).

Prior to the start of the second trial, the district court granted Clear Channel's motion in limine to exclude Selby's expert testimony as unduly speculative. The district court subsequently refused Andler's offer to have Selby testify in person and rely solely on Andler's actual historical earnings rather than BLS figures. Although Andler testified that her injuries prevented her from performing certain procedures that would have earned her an additional $50 per week, the court instructed the jury that it could not award any damages for loss of earning capacity because Andler had not produced evidence on reducing future earnings to present value. Clear Channel moved for judgment as a matter of law, again arguing that Andler was a licensee and that the hole

---

[1] This figure equals the difference between a pre-injury earning capacity figure of $323,688 and a post-injury figure of $91,342. Both figures are projections of what Andler would earn over the course of her working life, assuming that she would retire at age 67.

[2] The verdict form does not specify how much, if any, of the $148,000 is for loss of earning capacity rather than other future economic damages such as future medical costs.

was open and obvious, which the court denied.  The jury awarded Andler $10,000, which did not include any recovery for lost earning capacity.[3]

Andler timely appealed the exclusion of Selby's testimony, contending that his calculations of lost earning capacity were not unrealistically speculative.  Clear Channel cross-appealed the denial of its motion for judgment as a matter of law, arguing that the district court erred in finding both that Andler was an invitee rather than a licensee and that the open-and-obvious doctrine did not bar her claim.

## II.  ANALYSIS

### A.  Standard of Review

We review a district court's evidentiary rulings, including the decision to exclude expert testimony, for an abuse of discretion.  *Pride v. BIC Corp.*, 218 F.3d 566, 575 (6th Cir. 2000) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999)).  We review de novo the denial of a motion for judgment as a matter of law.  *Radvansky v. City of Olmsted Falls*, 496 F.3d 609, 614 (6th Cir. 2007).  Such a motion should "be granted only if in viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion, in favor of the moving party."  *Id.* (quoting *Gray v. Toshiba Am. Consumer Prods., Inc.*, 263 F.3d 595, 598 (6th Cir. 2001)).

### B.  Clear Channel's Cross-Appeal

#### 1.  Licensee vs. Invitee

Under Ohio premises liability law, a landowner's duty to someone who has come onto his land depends on whether the person is a trespasser, licensee, or invitee.  *See, e.g.*, *Gladon v. Greater Cleveland Reg'l Transit Auth.*, 662 N.E.2d 287, 291 (Ohio

---

[3]The award was originally $20,000, but was reduced by 50% to account for Andler's comparative negligence.

1996).[4] With invitees, the landowner has a duty to exercise ordinary care by maintaining the premises in a safe condition. *Provencher v. Ohio Dep't of Transp.*, 551 N.E.2d 1257, 1258 (Ohio 1990). With licensees, the landowner need only refrain from "wantonly or willfully causing injury" and is not liable for mere negligence. *Id.*

An invitee is someone who enters another's property "by invitation, express or implied, for some purpose which is beneficial to the owner." *Id.* A licensee, by contrast, enters "for his *own* pleasure or benefit, and not by invitation." *Id.* Andler was thus an invitee rather than a licensee if she provided some "economic (or tangible) benefit" to Clear Channel. *Id.* at 1259.[5] When the facts are undisputed, an entrant's status is a question of law for the court to determine. *Wiley v. Nat'l Garages, Inc.*, 488 N.E.2d 915, 922 (Ohio Ct. App. 1984).

The Ohio Supreme Court has not directly addressed the status of campers' guests for the purposes of premises liability. That court has held that a landlord owes the same duty of care to social guests of a tenant as to the tenant himself. *Shump v. First Continental-Robinwood Assocs.*, 644 N.E.2d 291, 296 (Ohio 1994). The landlord/tenant relationship is distinguishable, but *Shump* suggests that the Ohio Supreme Court would likely adopt Andler's position.

Further, the Ohio Court of Appeals has held that visitors of paying hotel guests are invitees. *Ray v. Ramada Inn N.*, 869 N.E.2d 95, 103 (Ohio Ct. App. 2007); *Uddin v. Embassy Suites Hotel*, 848 N.E.2d 519, 523 (Ohio Ct. App. 2005). A hotel owner "reasonably contemplates that members of the public will enter at the invitation of the guests, and the hotel benefits both directly and indirectly from accommodating its paying guests in that respect." *Ray*, 869 N.E.2d at 103. In the absence of a direct statement on the issue from the state supreme court, decisions of state appellate courts are "[r]elevant data" that "should not be disregarded unless we are presented with persuasive data that the [Ohio] Supreme Court would decide otherwise." *Allstate Ins. Co. v. Thrifty*

---

[4] The parties apparently agree that Ohio substantive law applies in this diversity case, even though neither conducts a formal choice-of-law analysis.

[5] Clear Channel does not contend that Andler was a trespasser.

*Rent-A-Car Sys., Inc.*, 249 F.3d 450, 454 (6th Cir. 2001) (quoting *Kingsley Assocs. v. Moll PlastiCrafters, Inc.*, 65 F.3d 498, 507 (6th Cir. 1995)).  *Shump* undercuts Clear Channel's argument that we should ignore *Ray* and *Uddin* as contrary to how the Ohio Supreme Court would rule on the issue.

Although she was not a paying guest at the campsite, Andler was visiting her friends who had paid to camp and thus provided an economic benefit to Clear Channel. Like a hotel, a campground benefits by accommodating its paying guests' desires to have visitors.  A campground that discourages visitors by declining to exercise ordinary care for their safety may lose paying guests.  This reasoning is particularly applicable when the campground is part of a large social event like a music festival where visitors are expected.  Clear Channel thus received some economic benefit from Andler's presence at its campground on July 14.  The benefit may have been somewhat indirect, but it was not intangible.  *Cf. Provencher*, 551 N.E.2d at 1258-59 (rejecting invitee status for a motorist injured at a highway rest stop because the increased highway safety the state achieved by providing such rest stops was only an intangible benefit).[6]

Clear Channel further argues that, even if Andler was an invitee when visiting her friends' campsite, she lost her invitee status when she left to listen to music and then to walk to the restroom and was thus a licensee at the time of her fall.  A person maintains invitee status so long as "she is on the part of the land to which the invitation extends and conforms her conduct to the terms of the invitation." *Conniff v. Waterland, Inc.*, 693 N.E.2d 1127, 1129 (Ohio Ct. App. 1997) (citing *Gladon*, 662 N.E.2d at 291-92). Determining the scope of the invitation is an objective inquiry that considers factors such as the landowner's conduct, the nature of the business conducted on the premises, and the arrangement and design of the premises.  *Id.* (citing *Blair v. Ohio Dep't of Rehab. & Corr.*, 582 N.E.2d 673, 677-678 (Ohio Ct. Cl. 1989)).

Because Andler was not a traditional invitee like a customer in a store, the scope of the invitation in this situation is more nebulous.  As described above, the "terms of

---

[6]Contrary to Clear Channel's assertion, Appellee/Cross-Appellant Br. at 29, *Provencher* did not reject the idea that an indirect benefit can confer invitee status.

the invitation" were that Andler was visiting paying guests of the campground. Again, the social atmosphere of a festival campground suggests a wide scope of invitation for visitors. Part of the festival experience is meeting fellow attendees with shared interests; in the case of Jamboree-in-the-Hills, this may well include seeking an audience or participants for impromptu jam sessions like the one Andler and Heitzer watched after leaving their friends' campsite. Festivalgoers may be more likely to select a campground that accommodates visitors even if they do not know those visitors prior to the visit. Even after leaving her friends, Andler was still visiting paying campers and thus providing the same benefit to Clear Channel.

A trip to the restroom cannot reasonably be considered a sufficient deviation to divest Andler of invitee status. Nor did she leave an area designated for invitees. *Cf. Gladon*, 662 N.E.2d at 292 (ticketed passenger lost invitee status when he left the train platform and went onto the tracks). The campground was not designed in such a way to direct visitors to stick to certain paths; the "path" Andler left before her fall had been created by the heavy car traffic from festivalgoers rather than officially designated as a trail for pedestrians.

### 2. Open and Obvious Danger

Regardless of an entrant's status, a landowner has no duty to warn her of "open and obvious" dangers and is thus not liable for any injuries resulting from such dangers. *Armstrong v. Best Buy Co.*, 788 N.E.2d 1088, 1089-90 (Ohio 2003). A danger is open and obvious if it is reasonably observable and thus would be seen by someone "acting with ordinary care under the circumstances"; the plaintiff need not actually have seen it. *Hissong v. Miller*, 927 N.E.2d 1161, 1166 (Ohio Ct. App. 2010) (internal quotation marks omitted). Although a pedestrian must use ordinary care in evaluating the safety of her surroundings, "an individual is not required, as a matter of law, to constantly look downward while walking." *Hudspath v. Cafaro Co.*, No. 2004-A-0073, 2005 WL 3528896, at *5 (Ohio Ct. App. Dec. 23, 2005) (citing *Grossnickle v. Vill. of Germantown*, 209 N.E.2d 442 (Ohio 1965)).

The observability determination "depends upon the particular circumstances surrounding the hazard," *Lykins v. Fun Spot Trampolines*, 874 N.E.2d 811, 818 (Ohio Ct. App. 2007) (internal quotation marks omitted), and is "extremely fact-specific," *Henry v. Dollar Gen. Store*, No. 2002-CA-47, 2003 WL 139773, at *4 (Ohio Ct. App. Jan. 17, 2003). Despite the plethora of slip-and-fall cases that have wended their way through the Ohio courts, previous decisions regarding open and obvious dangers are thus of "limited value." *Hissong*, 927 N.E.2d at 1167. Although the open-and-obvious doctrine goes to the existence of a duty, which is a question of law, observability can be rendered a question for the jury when the underlying facts are disputed and reasonable minds could disagree. *See e.g.*, *Hissong*, 927 N.E.2d at 1167; *Henry*, 2003 WL 139773, at *2-3.

Because the record contains conflicting evidence as to whether the hole was reasonably observable, judgment as a matter of law would have been inappropriate. Both parties point to the trial testimony of James Vincent as support for their position. Vincent testified that he saw the hole (which he refers to as a "trench") prior to Andler's fall, suggesting that it was observable, but he also stated that "it was very difficult to see" and "[y]ou couldn't see it unless you either fell in it or walked right up to it and happened to look down." R.149 at 140, 142 (Trial Tr.). Andler did not have an ongoing duty to look downward as she walked, especially when doing so might cause her to careen into other people who were nearby. *See Hudspath*, 2005 WL 3528896, at *5. Moreover, Vincent saw the hole in daylight, but Andler fell at night. Clear Channel thus has not shown that a "reasonable jury would not have a legally sufficient evidentiary basis to find for [Andler] on that issue." Fed. R. Civ. P. 50(a). Indeed, the jury found, in response to a special interrogatory, that the hole was not an open and obvious danger.[7]

---

[7]Clear Channel points to *Fawley v. Kings Island*, an unpublished Ohio Court of Appeals decision holding that, because holes are to be expected in natural areas, landowners are not liable for resulting injuries unless they had superior knowledge of the dangerous condition. No. CA2004-01-012, 2004 WL 1829477, at *2 (Ohio Ct. App. Aug. 16, 2004); *see also Radford v. Nat'l Whitetail Deer Educ. Found.*, No. 10-CA-24, 2011 WL 334817, at *3-4 (Ohio Ct. App. Jan. 31, 2011). Whether a condition is expected is different than whether it is observable, however, and the latter is the touchstone for the open-and-obvious doctrine. *See, e.g.*, *Hissong*, 927 N.E.2d at 1166. Without uncontested evidence that this hole was or could have been seen, judgment as a matter of law was properly denied.

Even if we were to follow *Fawley*, the record contains at least some evidence that Clear Channel employees were told of the danger prior to Andler's fall. Vincent testified that he alerted members of the

Clear Channel also contends that darkness itself is an open and obvious danger, such that it should not be liable for any injuries that occurred in the course of Andler's nighttime wanderings.  The Ohio Supreme Court case that Clear Channel cites for this proposition held that a plaintiff's disregard of darkness may be evidence of contributory negligence, not that the darkness itself is an open and obvious danger.  *See Jeswald v. Hutt*, 239 N.E.2d 37, 39 (Ohio 1968).  The various districts of the Ohio Court of Appeals appear to be split on the issue.  *Compare Hunter v. Jamin Bingo Hall*, No. L-08-1084, 2008 WL 4093685, at *2 (Ohio Ct. App. Sept. 5, 2008) ("Ohio courts have consistently recognized that darkness is an open and obvious condition."), *with Hissong*, 927 N.E.2d at 1168-69 (distinguishing the "step-in-the-dark rule" from the open-and-obvious doctrine).  Even if Clear Channel is correct, questions of fact exist as to how dark the area of the campground where Andler fell actually was.  Andler and Vincent both testified that the area was sufficiently lit by generators from nearby campers that people could see where they were walking.  Accordingly, the district court correctly determined that judgment as a matter of law was inappropriate.

## C.  Andler's Expert Witness

### 1.  Loss of Earning Capacity

A tort plaintiff can recover future economic damages for any loss of earning capacity caused by her injury.  A plaintiff claiming lost earning capacity must offer sufficient proof of (1) "'future impairment'" and (2) "'the extent of prospective damages flowing from the impairment.'"  *Eastman v. Stanley Works*, 907 N.E.2d 768, 776 (Ohio Ct. App. 2009) (quoting *Powers v. Kirkpatrick*, No. 99AP-1026, 2000 WL 992028 (Ohio Ct. App. July 20, 2000)).  The measure of damages in the second step is "'the difference between the amount which the plaintiff was capable of earning before his injury and that which he is capable of earning thereafter.'"  *Id.* at 775 (quoting *Hanna v. Stoll*, 147 N.E. 339 (Ohio 1925)).  Because predictions about future earning potential are necessarily somewhat speculative, an exact calculation of what the plaintiff could have earned but

---

staff about the hole on July 12.  R.149 at 132 (Trial Tr.).  A question of fact thus exists as to whether Clear Channel had superior knowledge of the hole at the time of Andler's injury.

for the injury is not required; a plaintiff must prove damages with "reasonable certainty." *Id.* at 776.

The damages are awarded for loss of earning *power*, not simply loss of earnings. The proper focus is thus what the injured plaintiff could have earned over the course of her working life without the injury versus what she will now earn, not what she earned or will earn in any given year. *See id.* (plaintiff must show that "the amount of wages [he] will be capable of earning over his working life after his injury is less than the amount of wages he was capable of earning over his working life before his injury"). Accordingly, the fact that a plaintiff earns a higher annual salary after an injury than she did prior to the injury does not bar her from recovering for loss of earning capacity. *See, e.g.*, *Taylor v. Freedom Arms, Inc.*, No. CT2008-0071, 2009 WL 3863123, at *3 (Ohio Ct. App. Nov. 17, 2009); 2 Stein on Personal Injury Damages § 6.9 ("A plaintiff who, at the time of trial, is receiving higher wages than those which he or she was earning at the time of the injury, may nevertheless recover for impairment of earning capacity."); D.E. Ytreberg, Annotation, *Sufficiency of Evidence, in Personal Injury Action, to Prove Impairment of Earning Capacity and to Warrant Instructions to Jury Thereon*, 18 A.L.R. 3d 88, §2[b] (1965 & Supp. 2011) ("[P]roof that earnings increased or remained the same between the time of injury and the time of trial does not necessarily bar a recovery for impairment of earning capacity. . . ."). In such situations, the plaintiff can still recover if she can show that she would have earned even more over the course of her working life if she had not been injured.[8]

Similarly, "the jury may consider the earnings of the plaintiff at the time of the injury, but the jury is not bound to accept such earnings as conclusive of his future earning power." *Bartlebaugh v. Penn. R. Co.*, 78 N.E.2d 410, 413 (Ohio Ct. App. 1948), *judgment modified*, 82 N.E.2d 853 (Ohio 1948). A plaintiff who is unemployed or

---

[8]A plaintiff who earns a higher salary after her injury still faces a greater likelihood of exit from the workforce than if she had not been injured and thus may still suffer a loss of earning capacity. Indeed, because Andler's projected pre-injury and post-injury salaries were the same, the entire amount of her purported damages for loss of earning capacity stemmed from the increased likelihood that she would exit the workforce. Clear Channel does not appear to have challenged this element of Selby's testimony in its motion in limine.

otherwise earning below her potential at the time of injury, for example, can recover damages for lost earning capacity, as can an injured child, student, or homemaker. *See id.*; 30 Ohio Jur. 3d *Damages* § 42; *see also* 29 Am. Jur. *Proof of Facts* 3d 259, § 4 (1995 & Supp. 2011) ("[I]f the plaintiff was underemployed at the time of the accident, and can prove it, the plaintiff should be entitled to prove loss of earning capacity based upon his or her true capabilities and potential without regard to the less-favorable earnings or employment record at the time of the accident.").

Departures from actual pre-injury earnings must be justified and cannot be unduly speculative. Like all expert testimony, an expert witness's calculations of future earning capacity are inadmissible under Federal Rule of Evidence 702 if based on "unsupported speculation." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589-90 (1993). Such testimony should be excluded if it is based on "unrealistic assumptions regarding the plaintiff's future employment prospects," *Boucher v.U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996), or "facts that [a]re clearly contradicted by the evidence," *Boyar v. Korean Air Lines Co.*, 954 F. Supp. 4, 8-9 (D.D.C. 1996). In *Boucher*, for example, the court held that an expert's figures for pre-injury earning capacity based on full-time employment, fringe benefits, and annual raises should have been excluded because the plaintiff's actual employment history had been "seasonal and intermittent." 73 F.3d at 22.

Testimony regarding what an injured plaintiff could have earned should take into account factors such as the plaintiff's age, employment record, training, education, ability to work, and opportunities for advancement. *See Bartlebaugh*, 78 N.E.2d at 413; Restatement (Second) of Torts § 924 cmt. d (1979). Further, an expert may reasonably depart from historical earning patterns in light of changed circumstances that occurred prior to the injury but were not yet reflected in the plaintiff's actual salary. *See Boucher*, 73 F.3d at 22 (listing "a change in family responsibilities" and "the acquisition of a new set of skills" as relevant factors).

When calculating earning-capacity factors such as projected salary and years in the workforce, experts often consult actuarial tables, Bureau of Labor Statistics figures,

or other averages along with the plaintiff's historical earnings.  *See e.g.*, *Taylor*, 2009 WL 3863123, at \*3; *Deyo v. Adjutant General's Dep't*, No. 93API12-1667, 1994 WL 425003, at \*6 (Ohio Ct. App. Aug. 16, 1994); *see also Tatum v. Land*, No. 95-6378, 1997 WL 85144, at \*4 (6th Cir. Feb. 26, 1997) (unpublished opinion) ("In this case as in other similar cases, we cannot really know what the decedent would have earned in the future, and earnings projections are essential.").  We held in *Cappello v. Duncan Aircraft Sales of Florida, Inc.* that calculating lost earning capacity based on the plaintiff's actual average income for the previous five years was unreasonable, in part, because that figure was inconsistent with the average lifetime earnings profile for someone in the plaintiff's position.  79 F.3d 1465, 1476 & n.18 (6th Cir. 1996).

### 2.  Daniel Selby

The district court granted Clear Channel's motion in limine to exclude the testimony of expert witness Daniel Selby regarding Andler's loss of earning capacity on the grounds that he used a statistical average salary in calculating Andler's pre-injury earning capacity that was several thousand dollars higher than Andler's actual pre-injury annual salary.  The district court found Selby's methodology to be "unreasonable speculation" and thus inadmissible.[9]

The concern with the use of BLS averages rather than Andler's actual historical earnings suggests a confusion of the concepts of lost earnings and lost earning capacity.  As explained above, lost earning capacity does not necessarily rely on a plaintiff's historical earnings.  What matters is what Andler would have earned over the course of her working life, not what she earned in any given year.  Andler's historical earnings are relevant, but the fact that she did not meet her earning capacity in the two years prior to her injury does not necessarily render Selby's projections inaccurate or even unreasonable.  Although Andler did not work full-time before her injury, Selby's projection that she would work full-time is not "clearly contradicted by the evidence." *Boyar*, 954 F. Supp. at 9.  Andler testified that she took the childcare job after her

---

[9]The district court also found that the testimony of Dr. Dane Wukich provided a sufficient basis for Selby's assumption that Andler would suffer future medical impairment.  We agree.

divorce because it was located in the district where her children attended school and she "wanted things to pretty much stay the same for my kids until they got out of elementary school." R. 148 at 35 (Trial Tr.). Working at the childcare center, she was able to "be[] there for them before and after school." *Id.* This testimony suggests she may have changed jobs once her children were older.[10] Moreover, Andler had attended massage school and had worked for a chiropractor before working at the childcare center, *id.* at 36-37, training that could position her for a switch in career. Finally, Andler explained that her post-injury switch to cosmetology work was "what I was already wanting to do." *Id.* at 36.

Selby's testimony that Andler would have earned more over the course of her working life than the earning capacity suggested by her salary in the two years prior to her injury is not unreasonable as a matter of law. Unlike Boucher, for example, Andler maintained regular employment and worked all the hours that were available to her at the childcare center. The shift from part-time to full-time, especially for a mother as her children grow older, is not as speculative as the shift from seasonal employment to a regular 40-hour workweek with full benefits. Selby's testimony involves a degree of speculation, as does all analysis of future damages, but not unrealistic speculation. The factual basis for using full-time averages in Selby's pre-injury earning capacity calculation may not be particularly strong, but "it is not proper for the Court to exclude expert testimony 'merely because the factual bases for an expert's opinion are weak.'" *Boyar*, 954 F. Supp at 7 (quoting *Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549, 567

---

[10] Andler's situation is thus somewhat akin to the case of the injured homemaker, who can recover for lost earning capacity even if he or she had never worked outside of the home prior to the injury. *Cf.* 29 Am. Jur. *Proof of Facts* 3d 259, § 8 (2005) ("The homemaker who has never worked outside the home a day in her married life . . . is entitled to damages for lost earning capacity, if she is injured by a tortfeasor and thereby becomes unable to seek or perform work outside the home."); William Danne, Jr., Annotation, *Admissibility and Sufficiency, in Personal Injury or Wrongful Death Action, of Evidence as to Earnings or Earning Capacity from Position or Field for Which Person Has Not Fulfilled Education, Training, or Like Eligibility Requirement*, 7 A.L.R. 6th 1, § 2 (2005) ("[D]amages for loss or impairment of earning capacity may be awarded to . . . an injured housewife, even if she had left employment with the intention of confining her future activities to homemaking.").

(D.C. Cir. 1993)).  The jury could have weighed Selby's opinion, informed by Clear Channel's vigorous cross-examination.[11]

Because we conclude that the district court's initial decision to exclude Selby's testimony was an abuse of discretion, we do not address Andler's alternative argument that the court should have allowed Selby to testify in person using Andler's historical earnings in his calculations of lost earning capacity.

### III.  CONCLUSION

Because Andler was an invitee under Ohio law and questions of fact existed as to whether the grassy hole was an open and obvious danger, we AFFIRM the denial of Clear Channel's motion for judgment as a matter of law.  We REVERSE the grant of Clear Channel's motion in limine excluding the testimony of Andler's expert witness as an abuse of discretion premised on a misunderstanding of the concept of lost earning capacity, VACATE the jury's award, and REMAND for a partial new trial on the issue of damages.

---

[11]We also note that, despite Clear Channel's protestations, Selby's use of projected inflation and interest rates and statistical averages on the likelihood of exit was proper when determining lost earning capacity.  Such projections are standard tools of economic analysis, which attempts to address uncertainties though the use of averages and presumptions regarding human behavior.  Notably, the district court did not base its ruling on the fact that Selby utilized such figures.